21 N.J. Super. 18 (1952)
90 A.2d 740
NEW JERSEY STATE BOARD OF OPTOMETRISTS, PLAINTIFF-RESPONDENT,
v.
JOSEPH C. NEMITZ, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 16, 1952.
Decided July 10, 1952.
*22 Before Judges EASTWOOD, BIGELOW and FRANCIS.
Mr. William K. Miller argued the cause for plaintiff-respondent (Mr. Theodore D. Parsons, Attorney-General).
Mr. George Pellettieri argued the cause for defendant-appellant.
The opinion of the court was delivered by FRANCIS, J.C.C.
Appellant, Joseph C. Nemitz, is a licensed optometrist of this State. On May 10, 1950 a complaint *23 seeking suspension or revocation of his license was filed with the New Jersey State Board of Optometrists, charging him with the violation of (1) R.S. 45:12-11(b), that is, gross incompetency, in that he supplied improper lenses, not in accordance with a prescription issued, (2) R.S. 45:12-11(c), that is, obtaining a fee by fraud and misrepresentation, in that "he failed to supply the finest lenses and frames in accordance with his offer which was relied on by the patient," and (3) R.S. 45:12-11(h), in that "he used misleading statements in advertising." Two hearings were held on these charges, the first on July 20, 1950, and the second and final one on November 7, 1951. The record contains a document, marked "Resolution," which recites:
"Now therefore, be it resolved, on this 19th day of December 1951, that the New Jersey State Board of Optometrists finds from the evidence, testimony and exhibits produced, as aforesaid, the said Joseph C. Nemitz, the holder of a license to practice Optometry, issued by the said Board pursuant to the provisions of Chapter 12 of Title 45 of the Revised Statutes, guilty of having violated the provisions of Section 45:12-11(b) of the Revised Statutes in that the said Joseph C. Nemitz, the holder of the aforesaid license, during April of 1950 did supply improper lenses to his patient, Mrs. Dorothy F. Wilson, not in accordance with a prescription issued by him, and guilty of having violated the provisions of Section 45:12-11(c) of the Revised Statutes in that the said Joseph C. Nemitz, the holder of the aforesaid license during the month of April 1950, did obtain a fee by misrepresentation and the practice of deception upon his patient Mrs. Dorothy F. Wilson, in that he failed to supply the finest lenses and frames in accordance with his offer, which was relied on by his patient the said Mrs. Dorothy F. Wilson and guilty of having violated the provisions of Section 45:12-11(h) of the Revised Statutes in that the said Joseph C. Nemitz, the holder of the aforesaid license during April 1950, did use misleading statements in his advertising, all of which is contrary to and in violation of the provisions of said Sections 45:12-11(b), 45:12-11(c) and 45:12-11(h) of the Revised Statutes; and the said Board for these reasons hereby suspends for a period of ninety (90) days, commencing February 1, 1952 and ending April 30, 1952, the license to practice Optometry issued to the said Joseph C. Nemitz."
From this suspension Nemitz appeals.
*24 It is first argued that the evidence adduced at the hearings does not support the finding of guilt. The principal witness in support of the complaint was one, Dorothy F. Wilson, a patient of Dr. Emanuel C. Nurock. He had previously prescribed certain bifocal glasses for her, which cost $45. He is a member of the board and, as indicated, is referred to in the sworn complaint as assistant secretary thereof. In other places in the record he is variously referred to as secretary and assistant secretary.
It appears that Dr. Nurock made arrangements with Mrs. Wilson to assist him in an investigation of the defendant. He told her that there was some question of Dr. Nemitz' ethics. As he stated during one of the hearings, he explained to her that the defendant "was not doing things" in accordance with a certain offer he had made to a union with respect to eye examinations and the furnishing of glasses, and he asked her to go to Nemitz' office, arrange for an examination, obtain a prescription, and purchase the prescribed glasses.
In April, 1950 she visited defendant, was examined, and asked for and obtained a prescription. Then she went back later and received her glasses. The cost of the examination and glasses was $11.90, which sum she paid with money advanced by Dr. Nurock for the purpose and she turned over to him both prescription and glasses almost immediately. According to her testimony she heard that defendant had made some reduced price offer to the union of which she was a member, such as, an average cost of $9.90 for the glasses plus $1 for the examination. This was the extent of her knowledge of the plan; she called the union to find out more about it but "no one seemed to know." She made no statement that she mentioned the offer on her visit to the defendant. He examined her and recommended bifocals. She was given her choice of frames; no representations of any kind were made and no effort was made to sell her any particular product. She wore the glasses furnished for an hour before turning them over to Dr. Nurock; they were satisfactory; *25 she felt that they were correct and that she could have continued to wear them.
Over objection by defendant certain interrogatories, which had been served upon the board and answered by it, were received in evidence. Under the Civil Practice Rules (3:33, 3:26-4), subject to the rules of evidence, answers to interrogatories may be used to the same extent as a deposition of a party. Manifestly it would be improper in a court proceeding to permit the self-serving statements of a party to be introduced for the purpose of establishing his own cause. While an administrative agency is not a court and therefore the rules, as such, are not applicable, when the board sits in a quasi-judicial capacity, as in this case, if interrogatories are to be used, adherence to the rules with respect to their evidential competency would appear to be a worthwhile safeguard. Mulhearn v. Federal Shipbuilding and Dry Dock Co., 2 N.J. 356 (1949); Welch v. County of Essex, 6 N.J. Super. 422, affirmed 6 N.J. Super. 184 (App. Div. 1950). However, we do not feel that prejudicial error resulted from their admission. It seems apparent that they were introduced simply to put in the record a copy of the plan offered by defendant to Mrs. Wilson's union, under which the members could have eye examinations and obtain glasses. Defendant, in his own testimony, identified the paper as an outline of his offer and said that he distributed it at a general union meeting on an occasion when he gave a lecture describing the plan. And he admitted that the union accepted the plan. Only two statements contained in the outline are involved particularly in this proceeding. They are:
"3. Average cost of a pair of single vision glasses is $6.80. Average cost of a pair of bifocal glasses is $8.90.

* * * * * * * *
5. Finest quality lenses and frames used."
Only one other witness of importance was produced in support of the complaint. This person had been in the employ of the Bausch and Lomb Optical Company for about 20 *26 years, first as a lens surface grinder and later as manager, but he was not an optometrist. He examined the glasses supplied to Mrs. Wilson under an instrument known as a Photometer, which measures the power of lenses. Then he compared his findings with the prescription issued by defendant and in his opinion there was a slight difference in the left lens. It was a "slight error," namely, one-eighth of a diopter, a diopter in lenses being the unit of refractive power. Such a difference can come about in the grinding of the lens; also examination of a lens on two different instruments might reveal a variance to this extent.
The witness identified the type bifocal lens appearing in the glasses as Kryptok. Upon being asked by a member of the board as to whether it was the finest type bifocal lens that could be used for a patient, he answered in the negative and said better and more expensive bifocals are made. However, he conceded that much depends on the individual preference of the optometrist; some consider one better than the other and a Kryptok will do the work of any other bifocal lens.
Dr. Nemitz testified that before releasing the glasses he examined the lenses on a Lensometer, which he described as similar to a Photometer, and found them to be accurate in relation to the prescription. In any event, a variance of one-eighth of a diopter in a lens would be within the recognized limits of tolerance; it would have no effect on efficiency and would not be considered inconsistent with the prescription. Also, before turning the glasses over to the patient he had her try them; she reacted very favorably to the test, made no complaints and said they were satisfactory.
With respect to the quality of the lenses and the frames, he said that while more expensive types are available, the ones he used were of the finest quality and as efficient as other types. In his judgment what is the finest lens is a matter of opinion. And, in any event, in dealing with Mrs. Wilson, he simply showed her the type frames he had available, made no recommendations with respect to them and she made her own selection.
*27 On this record, the defendant was found guilty of gross incompetence, obtaining a fee by misrepresentation, and of misleading advertising. Our review has led us to the conclusion that the result cannot be sustained.
A first consideration is the nature of the review we should allow in this type proceeding. Under the statute the "court is * * * authorized and empowered to review and correct the action of the Board." (R.S. 45:12-14). Whether an appellate court in reviewing an administrative agency determination should apply the test of the greater weight of the evidence, or substantial evidence on the whole record, or substantial evidence, or just some evidence, has been a controversial problem throughout the country for many years. Davis on Administrative Law, c. 20, p. 868; Report of Attorney General's Committee on Administrative Procedure (1941); Senate Document No. 8, 77th Congress, 1st Session (1941). On the federal scene the Administrative Procedure Act settled the formula to be applied, namely, is the judgment or order supported by "substantial evidence"? And in reaching that determination the court "shall review the whole record or such portions thereof as may be cited by any party." 60 Stat. 243, 5 U.S.C.A., sec. 1009. New Jersey has not adopted such an act, although one containing the same scope of review has been proposed. In re Larsen, 17 N.J. Super. 564, concurring opinion on p. 574 (App. Div. 1952). Under the Rules of Civil Practice we are authorized to make independent fact findings "to such extent as the interests of justice may require" (3:81-13) and it has been suggested that the power should be exercised cautiously, at least in passing upon the "finding of an experienced agency of demonstrated competence." In re Larsen, supra, p. 577. In any event, in the present problem, putting aside the rule and testing the evidence in the crucible of substantial evidence, the determination of the board cannot be supported.
No expert witness was produced in opposition to the testimony of the defendant. The record is barren of any evidence to show that a variance of one-eighth of a diopter from *28 a prescription is not within the standard of tolerance, that it creates a recognized hazard for the user of such glasses or that it constitutes gross incompetence to deliver such glasses to a patient. As already alluded to, the expert who examined the lenses frankly admitted he was not qualified to express an opinion either on the matter of tolerance or effect of the deviation on the patient or on the efficiency of the lens. Our inquiry at the oral argument as to where any such evidence, expert or otherwise, appeared in the record produced the answer that the five members of the board were all experts and it must be assumed that their opinions were contrary to that of the defendant. This startling theory, if recognized, would not only render absolute a finding opposed to uncontradicted testimony but would render the right of appeal completely inefficacious as well. A board of experts, sitting in a quasi-judicial capacity, cannot be silent witnesses as well as judges. Their value as experts in the judging process contemplated by the statutory disciplinary proceeding, consists in the application of their special knowledge to the factual controversy appearing within the record made at the hearing.
The very essence of due process is the opportunity to hear and controvert the evidence upon which the issue presented is to be decided. Factual knowledge on that issue, expert or otherwise, of the triers of the facts is not evidence and cannot form the basis in whole or in part of the ultimate judgment. Morgan v. U.S., 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). To sanction such practice would be to frustrate the fundamental right to a hearing. The "requirement of a `hearing' has reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts and the issue determined uninfluenced by extraneous considerations which might not be exceptionable in other fields involving purely executive action. The `hearing' is `the hearing of evidence and argument.'" (Italics ours.) Handlon v. Town of Belleville, 4 N.J. 99 (1950); Weaver v. N.J. Department of Civil Service, *29 6 N.J. 553 (1951). Our courts have said that a judgment or order of an administrative agency "cannot be made to rest upon undisclosed evidence or information dehors the record which the parties in interest have had no opportunity to test for trustworthiness and explain or rebut." Pennsylvania R.R. Co. v. N.J. State Aviation Comm., 2 N.J. 64, 72 (1949); National Dairy, etc., Co. v. Milk Control Board, 133 N.J.L. 491, 494, 495 (Sup. Ct. 1945); Scaduto v. Bloomfield, 127 N.J.L. 1 (Sup. Ct. 1941).
The United States Supreme Court in Ohio Bell Telephone Co. v. Public Utility Comm., 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1936), discussed the effect upon the efficacy of a review of a finding by a quasi-judicial body where certain material facts did not appear in the record. Justice Cardozo, speaking for the court, said:
"In such circumstances judicial review would be no longer a reality if the practice followed in this case were to receive the stamp of regularity. To put the problem more concretely: how was it possible for the appellate court to review the law and the facts and intelligently decide that the findings of the Commission were supported by the evidence when the evidence that it approved was unknown and unknowable?" (P. 303)
"What the Supreme Court of Ohio did was to take the word of the Commission as to the outcome of a secret investigation, and let it go at that. `A hearing is not judicial, at least in any adequate sense, unless the evidence can be known.'" (P. 304)
The Rhode Island case of Macomber v. State Board of Health, 28 R.I. 3, 65 A. 263, 8 L.R.A. (N.S.) 585 (Sup. Ct. 1906), involving a proceeding to revoke a license to practice medicine, bears closely upon our problem. The court said:
"The evidence is submitted to this court as if the court were a body of medical experts fully qualified to pass upon all the numerous medical questions involved. It is hardly necessary to say that this court disclaims such qualification and cannot take judicial notice of such matters, but is bound to form its judgments in such matters solely upon evidence adduced before it.
* * * As to the mechanical efficiency of the `Electricure,' whether or not it is capable of producing an electric current or `thermal electricity,' it would have been very simple to have subjected *30 the device to the examination of well-known electrical experts, under the conditions named in the circulars, and to have shown whether or not in fact any such electrical energy was produced; * * *."
Aside from the serious question as to whether a single mistake involving a variance of one-eighth of a diopter in a lens, even assuming it to result in an impairment of efficiency of the glasses, constitutes gross incompetence within the meaning of the statute, which it is not necessary to decide on this appeal, it is plain on this phase of the charges that the finding of guilt can not be sustained.
The two other charges of dereliction arise out of the so called advertisement. As the result of it two conclusions seem to have been reached. One, that the defendant obtained a fee "by misrepresentation and the practice of deception as he failed to supply the finest lenses and frames in accordance with his offer which was relied upon by his patient," and secondly, that he employed misleading public assertions.
First of all, the patient had no knowledge of the particulars of the defendant's offer except that some price reduction advantage was to be allowed union members. No representations were made directly to her and she exercised a completely independent judgment in selecting her frames.
Examination of the "advertisement" supports the defendant's statement that it was an outline of his plan for the union members. It is not the usual narrative public advertisement and it must be given a reasonable interpretation in the light of its purpose. The statement, "finest quality lenses and frames used," must be studied with the representation that "average cost of pair of bifocals is $8.90." It must be assumed that the ordinary member of the public is aware that frames are made of various types of metal, shells, plastics and the like, and that they are of varyng cost. No reasonable person reading the full text of the offer would be misled into believing that he would receive platinum frames with lenses for $8.90; on the contrary, such person would probably conclude that the finest quality lenses and frames *31 in relation to the cost would be used and that he could make some saving on the average market price through dealing with the defendant. Conceding a certain amount of puffing to be implicit in the statements, they do not constitute "misleading" advertising within the purview of section 11(h) of the act or support a finding that a fee received as the result thereof was paid because of misrepresentation or deception in violation of section 11(c). Looked at in its entirety, the circular, in our judgment, is not so "intentionally false, deceitful or delusive or calculated to lead astray or to cause error" as to constitute an infraction of the legislative policy. Abelson's, Inc. v. New Jersey State Board of Optometrists, 5 N.J. 412, 422 (1950).
As to the lenses, Dr. Nemitz admitted that there were more expensive ones than those furnished but he insisted that quality and efficiency for a particular patient are matters of opinion. The Kryptok lens he utilized, in his judgment, is quite as good and as efficient as the more expensive ones. In this he found some, though not complete support from the prosecution's expert. Here again, judged solely by the proof in the record, violation of either of the two sections of the act was not established by substantial evidence.
While these considerations necessarily lead to a reversal of the order of suspension, further important issues are presented which require determination. Three of these issues are somewhat related and may be considered together. The resolution suspending appellant's license is attacked as, (1) not containing a proper finding of facts, (2) as not signed by all the members of the board who heard the charges, and (3) because the board which rendered the decision did not hear the entire case, all being contrary to section 13 of the act.
Section 13 provides:
"The board shall reduce its findings to writing, to be signed by all the members who have heard the charges. If the board unanimously finds that the charges, or any of them, are sustained, it may thereupon, in its discretion, revoke or suspend the certificate of registration. * * *"
*32 We are concerned here with a penal statute, transgression of which, when found by the board, unquestionably brings down serious and prejudicial consequences upon the professional standing of the transgressor. Therefore strict construction is imposed upon the board and the courts. Abelson's Inc. v. New Jersey State Board of Optometrists, supra.
The legislative mandate for the reduction of findings to writing is a matter of substance and, if not complied with, renders the proceeding fatally defective. New Jersey Bell Telephone Co. v. Communication Workers, etc., 5 N.J. 354 (1950). The reason for findings is helpfully set forth in Saginaw Broadcasting Co. v. Federal Communications Commission, 68 App. D.C. 282, 96 F.2d 554 (Ct. App. D.C. 1938), as follows:
"The requirement that courts, and commissions acting in a quasi-judicial capacity, shall make findings of fact, is a means provided by Congress for guaranteeing that cases shall be decided according to the evidence and the law, rather than arbitrarily or from extra legal considerations; and findings of fact serve the additional purpose, where provisions for review are made, of apprising the parties and the reviewing tribunal of the factual basis of the action of the court or commission, so that the parties and the reviewing tribunal may determine whether the case has been decided upon the evidence and the law or, on the contrary, upon arbitrary or extra legal considerations."
Findings cannot be considered adequate unless they meet certain well recognized criteria. They should be "a recitation of the basic facts established by the evidence as found by the trier of the facts, from which may be inferred the ultimate facts in terms of the statutory criterion required as a basis for a particular order" (42 Am. Jur. 500, Public Administrative Law, sec. 151); "they must be sufficiently definite and certain to enable the court to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order". (Id., p. 499) and "there should be some rational or inherent relationship between the basic facts and the ultimate facts, and the latter should flow *33 logically from the former." (Id., p. 500; Annotation 124 A.L.R. 992-994).
Appraised in the light of these postulates the resolution is substantially deficient. Defendant is found guilty of gross incompetence because he furnished improper lenses to his patient, not in accordance with a prescription issued by him. However, none of the basic facts upon which this ultimate conclusion was reached are set forth. No reference is made to any testimony supporting the conclusion that the lenses were "improper" or not in accordance with the prescription, so as to demonstrate the statutory offense of "gross incompetence." The same criticism may be leveled at the portions of the resolution which dispose of the charges of obtaining a fee by misrepresentation and deception and of issuing misleading advertising. Again ultimate conclusions are stated without reference to the basic facts which justify them. The inadequacy of the resolution alone would be sufficient reason for reversing the determination of the board. New Jersey Bell Telephone Co. v. Communication Workers, etc., supra; Levine v. State Board of Registration, etc., Dentistry, 14 N.J. Misc. R. 738 (Sup. Ct. 1936).
A further deficiency appears in the resolution. It is not signed by "all the members of the board who heard the charges"; in fact, it is not signed at all. The record contains a purported resolution which does not bear the seal of the board (of which judicial notice may be taken. Sec. 4). Appended to it is a certificate signed by Emanuel C. Nurock, whose official position is not designated, to the effect that it is a true copy of the original document of which he is the "legal keeper." The act provides that the board shall adopt a seal, annually elect a secretary-treasurer, and that the secretary shall keep a record of all its proceedings. According to the complaint Nurock is not secretary but assistant-secretary, although, as indicated earlier, in other places in the record he is referred to as secretary.
Determinations of administrative bodies must conform to the statute governing the particular proceeding. They must *34 be in proper form and authenticated as prescribed thereby. 42 Am. Jur., Public Administrative Law 501, sec. 152; Morgan v. U.S., 298 U.S. 468, 477, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). Under the statute involved an indispensable requisite to a valid determination are the signatures of "all the members who have heard the charges." The non-compliance renders the license suspension invalid.
An additional unusual situation is presented. The respondent is a five-man board (Sec. 12-2). The act directs that:
"When charges are preferred, the board, or a majority thereof, shall hear and determine them, * * *."
The first hearing in this matter was held on July 20, 1950. The appendix shows that at this time four members sat, the President, Dr. Arthur R. Neale, Jr., and Drs. Emanuel C. Nurock, Philip Jackman and Louis Rochat. On this occasion all of the direct case of the board in support of the complaint was completed. The second and final hearing occurred on November 7, 1951 and in the meantime the composition of the board had changed. Then the hearing tribunal consisted of the new president, Dr. Philip Jackman, and Drs. Emanuel C. Nurock, Martin R. Snook, Harold Simmerman and Peter L. Ehrhardt, Jr. Thus it appears that only two members, Drs. Nurock and Jackman, a minority, heard all of the testimony. Respondent objected to the continuation of the hearing and suggested that the entire proof be put in again before this transformed body. The objection was overruled and the defense was then presented. The resolution disciplining Nemitz does not say what members voted or that the vote was unanimous; the recital is simply that the "State Board of Optometrists finds, etc." In disciplinary proceedings of this character, where problems of credibility, and attitude and demeanor of witnesses are so often vital, great care must be taken to safeguard the right of the alleged transgressor to a fair and adequate hearing. It cannot be *35 said in this instance that the majority of the board heard and determined the charges. And it was clearly impossible for "all who have heard" to sign the findings. For this reason also the resolution is not sustainable. Pennsylvania Railroad Company v. New Jersey State Aviation Commission, supra, p. 72; McAlpine v. Garfield Water Commission, 135 N.J.L. 497 (E. & A. 1947).
Emphasis is placed upon the fact that only a minority of the board heard all the evidence and the prejudice resulting therefrom, because of defendant's contention that Dr. Nurock, one of the two members constituting this minority, should have disqualified himself as a member of the hearing tribunal on account of interest, bias or prejudice. The request for him to withdraw was made but he did not do so.
This member made the complaint. It must be considered as presented in his individual capacity because it was not made as secretary and there is no evidence that it was ordered filed on the motion of the board as section 11 of the statute permits.
Beyond this, Dr. Nurock caused the investigation to be made, procured the investigator, provided the funds for the examination, arranged for the testing of the glasses and comparison with the prescription, because, as he said, the defendant was not "doing things" in accordance with a certain offer he had made to a union and because a question of ethics was involved. Moreover the evidence shows that the investigator was his patient and that he had supplied her with bifocal glasses for a fee, which was $33.10 more than that charged by the defendant. Conceding his glasses to be constructed of finer and more expensive lenses and frames, which was not an issue at the hearing, a possible subconscious tendency to demonstrate the superiority of his own glasses, the inadequacy of the disputed glasses, and the incompetence of the competitor who was responsible for them, cannot be overlooked. Such a possibility should be avoided in the judicial process. When Mrs. Wilson was under cross-examination she said that Dr. Nurock told her about defendant's union *36 plan, and at this point he interrupted with, "I object to that." Later in the examination of the same witness he interjected: "I think we can object to that on the same basis as the ____." At another point the record shows:
"By Dr. Nurock:
Q. Mrs. Wilson, at the time I asked you to go to Dr. Nemitz's office did I explain to you that Dr. Nemitz had offered this plan that you were aware of and that he was not doing things in accordance with the offer and that was the reason I wanted you to go?
A. That's right. You said there was some question of ethics."
Again when the expert who examined the lenses was on the stand the doctor interrogated him at some length and with leading questions until the following colloquy took place:
"Mr. Pellettieri: Now wait a minute.
Dr. Nurock: I was wondering what was keeping you seated."
In addition he cross-examined the defendant vigorously, despite the presence of the Deputy Attorney-General who was presenting the proof, and at one point after Dr. Nemitz had given an answer, he said: "I disagree with you there." Whereupon the Deputy Attorney-General interposed: "Let's not argue, please." At another point Dr. Nurock again interrupted:
"It is the less expensive type of bifocal lens.
MR. PELLETTIERI: The kryptok?
DR. NUROCK: Yes.
MR. PELLETTIERI: That is why I asked.
DR. NUROCK: And the less efficient.
MR. PELLETTIERI: In your opinion?
DR. NUROCK: In the opinion of the authorities.
MR. PELLETTIERI: I ask all that be stricken. You gentlemen are not subject to cross-examination. I ask that the statement that all of the authorities consider it less efficient be stricken from the record. Let's try this with an open mind.
DR. NUROCK: Strike it from the record."
Under all of the disclosed circumstances Dr. Nurock should have disqualified himself. It may well be that his *37 entire participation was motivated by zeal in the discharge of a highly important public duty, which zeal does not disqualify (Wisconsin Telephone Co. v. Public Utility Service Comm., 232 Wis. 274, 312, 287 N.W. 122, 141, 142 (Sup. Ct. 1939)), but where the investigation, prosecution and judicial functions repose in the same board, its members must be zealous in the recognition and preservation of the right to hearing by impartial triers of the facts and the courts must impose a most careful supervision of that element of the hearing. Pyatt v. Mayor and Council of the Borough of Dunnellen, etc., 9 N.J. 548, 89 A.2d 1 (Sup. Ct. 1952); In re Larsen, supra.
This is not a case where the secretary of the board simply acted as a ministerial agent in filing the complaint, as in Gross v. New Jersey State Board of Optometrists, 11 N.J. Misc. R. 485 (Sup. Ct. 1933); nor is it within the stern necessity rule which would render essential his sitting as a member of the hearing tribunal. Pyatt v. Mayor and Council of the Borough of Dunnellen, etc., supra. Under the act, section 12, a majority of the board can hear and determine the charges.
For all of the above reasons the determination of the board and the suspension of appellant's license are reversed.