ABELSON'S, INC., MONROE SMALLZMAN AND HAROLD P. SELBERT, PLAINTIFFS-APPELLANTS, v. NEW JERSEY STATE BOARD OF OPTOMETRISTS, DEFENDANT-RESPONDENT AND CROSS-APPELLANT, AND MONROE B. ALBERT, ET AL., INTERVENING DEFENDANTS-RESPONDENTS.

Argued September 18, 1950—Decided October 16, 1950.

414

*Mr. William A. Consodine* argued the cause for appellants. (*Messrs. Crummy & Consodine,* attorneys).

*Mr. Henry F. Schenk,* Deputy Attorney General, argued the cause for the cross-appellant New Jersey State Board of Optometrists (*Mr. Theodore D. Parsons,* Attorney General, on the brief).

*Mr. William K. Miller* argued the cause for the intervening defendants-respondents (*Messrs. Berman, Neiss & Miller,* attorneys).

The opinion of the court was delivered by

HEHER, J. The primary question here is the constitutional sufficiency of certain provisions of the act regulating the practice of optometry, as amended by ch. 350 of the Session Laws of 1948. *R. S.* 45:12–1 *et seq.; P. L.* 1948, *p.* 1401. The proceeding was instituted under the Declaratory Judgments Act. *R. S.* 2:26–66 *et seq.* The complaint prays that the

amendatory act of 1948, or specific portions thereof, be adjudged unconstitutional and void as unduly restrictive of the right of private property and an arbitrary exercise of the police power; and that enforcement be enjoined forthwith to prevent immediate and irreparable injury.

A motion by the Attorney General to dismiss the bill of complaint as a suit against the State without its consent was denied. Certain provisions of the amendatory statute were declared unconstitutional, and their enforcement enjoined *pendente lite*. The statute was sustained otherwise. 3 *N. J. Super.* 332. Judgment to the same effect was entered on final hearing. Plaintiffs appealed to the Appellate Division of the Superior Court from the provisions of the judgment sustaining particular sections of the statute; and the defendant Board appealed from the declaration of constitutional insufficiency as to the remainder, and from the denial of its motion to dismiss the complaint. The appeals were certified here, before hearing, on the motion of the Board.

The Attorney General insists that the proceeding is a suit against the State to which it has not consented, and is therefore not maintainable. The reasoning is that, "as a State agency," the defendant Board "is an *alter ego* of the State, administering for the State matters with respect to the practice of optometry," and so the action is one against the State within the principle of *Strobel Steel Co. v. State Highway Commission*, 120 *N. J. L.* 298 (*E. & A.* 1938), that a suit against a State agency "is, in fact, a suit against the State, if the judgment obtained will operate to control the action of the State or subject it to liability."

The action here is not in that category. It is a proceeding under the Declaratory Judgments Act to determine the constitutional force of the challenged provisions of the cited statute, and to restrain the threatened enforcement of such of them as may be found deficient. The validity and construction of a statute and rights, status or other legal relations thereunder are proper subjects of inquiry under this statute. *R. S.* 2:26–69. There is no enlargement of juris-

diction over subject matter and parties. But there is provision for declaratory relief not obtainable under the pre-existing practice and procedure. The remedy is available in certain cases where no other action would lie. All courts of record are given power, within their respective jurisdictions, to declare rights, status and other legal relations, "whether or not further relief is or could be claimed." *R. S.* 2:26–68. This remedial power is equitable in nature, of a quality and breadth competent "to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations," and thus to advance the administration of justice. *R. S.* 2:26–67. *Vide New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235 (1949); *Guarantee Trust Company of New York v. Hannay & Company* (1915), 2 *K. B.* 536. The act does not modify the principle of the sovereign's immunity from suit without its consent. *Empire Trust Co. v. Board of Commerce and Navigation,* 124 *N. J. L.* 406 (*Sup. Ct.* 1940); *Provident Mutual Life Insurance Co. v. Unemployment Compensation Commission,* 126 *N. J. L.* 348 (*E. & A.* 1941).

A suit to restrain a state agency of the particular class from executing an unconstitutional statute, to the irreparable injury of the plaintiff's rights, is not one designed to control the action of the State or to subject it to liability within the principle of sovereign immunity from suit. This has been a common exercise of equitable jurisdiction. And under the State Constitution of 1844, acts done by this administrative authority in the enforcement of the challenged provisions of the act would have been reviewable on *certiorari* as an excess of power. By Article VI, Section V, paragraph 4 of the Constitution of 1947, the jurisdiction to grant relief under the prerogative writs was continued in the Superior Court, invocable as of right by proceedings in lieu thereof as provided by rules of the Supreme Court, except that in criminal cases the review shall be discretionary. Such a review by an action in the nature of *certiorari* is not a suit against the State; nor is a proceeding in advance of adverse action by

the state agency, either to avoid irreparable injury or to secure an adjudication under the Declaratory Judgments Act of what would not have been a justiciable controversy under the old practice, in that category. A proceeding to restrain the invasion of one's personal or property rights by an officer of the State presuming to act under color of an unconstitutional statute is not a suit against the State; the judgment sought will neither control the action of the State nor subject it to liability. The keeping of such agencies within lawful bounds does not constitute a restraint upon state action.

It is conceded that the practice of optometry is subject to regulation under the police power. The insistence is that the calling is not a "learned profession," but rather a "statutory profession" falling into the category of "occupations and businesses" reasonably regulable only in the particular areas in which the subject matter touches "the health or welfare of the community;" and that certain sections of the amendatory act of 1948 are wholly without relevancy to the public health, but serve the pecuniary interest of the optometrists alone, and so constitute a deprivation of property without due process of law in contravention of the Fourteenth Amendment of the Federal Constitution.

Optometry is not a mere trade or craft. It is an applied branch of the science of physiological optics, directed to the improvement of visual acuity through the correction of refractive errors. It is concerned with the phenomena of light reflection and refraction. Optics is the science which treats of the nature and properties of light and vision; ocular refraction consists of the adaptation and accommodation of the light rays which enter the eye in keeping with optical principles, to secure proper focus and the formation of an accurate image on the retina. Optometry is directed to the measurement of the range of vision and the correction, by lens, of visual defects and the increase of visual power with a minimum of eye exertion. Thus, the practice of optometry calls for scientific knowledge and skill in the use of refractive media. Want of knowledge of the scientific principles and

of the mechanism of accommodation, and loose practice are fraught with such danger to the delicate and vital organ of sight as to warrant strict regulation of the calling in the interest of health and safety; and, to that end, the State may adopt measures to insure technical knowledge and skill and proscribe practices and procedure that may be unexceptionable in the market place but do not comport with the standards of professional behavior commonly accepted today as essential to the practice of the healing art and its kindred pursuits relating to anatomical and physical function. While not an oculist or an ophthalmologist, an optometrist is not a tradesman or craftsman but a practitioner in a specialized field of physical science intimately identified with the public health, even though he is not trained in pathology. The practice of optometry involves, not alone the measurement of the powers of vision, but also diagnosis and prescription for the revealed ocular deficiency or deformity or visual or muscular anomaly of the eye; and this calls for scientific knowledge of the anatomy of the eye and the principles of physical optics, the area of physics relating to the direction, reflection and refraction of light. The statutory definition of optometry coincides with the technical sense of the term. It consists of "the employment of objective or subjective means, or both, for the examination of the human eye for the purpose of ascertaining any departure from the normal, measuring its powers of vision and adapting lenses or prisms for the aid thereof." *R. S.* 45:12–1.

Thus, by its very nature, the practice of optometry is subject to regulation for the protection of the public against ignorance and incapacity and deception and fraud, equally with the practice of ophthalmology and the other "learned professions," a category originally confined to theology, law and medicine, but long since broadened in keeping with the diffusion of scientific learning and the need of specialized knowledge in the functioning of our ever-expanding and complex society. *New Jersey State Board of Optometrists v. S. S. Kresge Co.,* 113 *N. J. L.* 287 (*Sup. Ct.* 1934) ; affirmed,

115 *N. J. L.* 495 (*E. & A.* 1935). The Legislature recognizes optometry as a profession calling for the exercise of scientific skill. One cannot qualify for the practice of the profession unless he has been graduated from an approved school or college of optometry with the degree of doctor of optometry. *R. S.* 45:12–1; 45:12–5.

But in the final analysis, it is the nature of the subject matter and the end to be served that determine the quality and content of the regulatory power. The public health is a paramount concern of government. Apart from the protection of the individual against incapacity and fraud, the correction of visual deficiencies bears a direct relation to the public safety and our general social and economic well being. The relationship is self-evident. The Legislature is invested with a broad discretion in the choice of means to serve this vital public interest, subject only to constitutional restraints and the rule of reason. If the measures invoked tend to serve a legitimate interest of society, the wisdom of the course taken is not ordinarily a justiciable question. When the subject lies within the police power of the State, "debatable questions as to reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment." *Sproles v. Binford,* 286 *U. S.* 374, 52 *S. Ct.* 581, 76 *L. Ed.* 1167 (1932). The range of the State's discretion in promoting the security and well being of the public "accords with the subject of its exercise." *Stirling v. Constantin,* 287 *U. S.* 378, 53 *S. Ct.* 190, 77 *L. Ed.* 375 (1932). Where the end is one to which legislative power may properly be directed, it is enough "if it can be seen that in any degree, or under any reasonably conceivable circumstances, there is an actual relation between the means and the end." *Stephenson v. Binford,* 287 *U. S.* 251, 53 *S. Ct.* 181, 77 *L. Ed.* 288, 298 (1932). In a word, the State's exercise of the police power for the protection of a valid public interest is not subject to judicial interference if the means employed are fairly adapted to that end.

In the regulation of professions of the particular class, the State may ban practices and procedures tending to

unseemly competition and the lowering of the standards of service which comport with the nature of the pursuit. "Professional ethics" is but the sum of professional experience as to standards of professional behavior; and the application of such codes of conduct bears a reasonable relation to the protection of the public interest. "Bait advertising," for example may be forbidden to practitioners of the healing art and allied callings as making for rivalry that would result in imposition and unfair dealing. *Semler v. Oregon State Board of Dental Examiners,* 294 *U. S.* 608, 55 *S. Ct.* 570, 79 *L. Ed.* 1086 (1935).

The provision of *R. S.* 45:12–9, as amended, barring the issuance of more than two branch office registration certificates to one licensee, is assailed as an unreasonable exercise of the police power. The reasoning of the Chancery Division is that this limitation has no bearing upon the "public health or interest," and so it denies or unreasonably curtails the common right to engage in a lawful business in violation of the Fourteenth Amendment of the Federal Constitution, citing *Regal Oil Co. v. State,* 123 *N. J. L.* 456 (*Sup. Ct.* 1939). We take a different view.

The Legislature thereby rejected the multiple shop or "chain store" principle as alien to the practice of optometry; and this was well within the range of legislative discretion to serve the statutory policy. As we have seen, the optometrist exercises professional skill and judgment; and it is readily conceivable that this limitation was designed to insure an adequate measure of personal performance and supervision in keeping with the nature of the service and the avoidance of the evils of competition which has its place in trade and mercantile pursuits but not in the practice of this profession.

*R. S.* 45:12–11(h) empowers the administrative authority to refuse a license to practice optometry or to revoke or suspend a license granted for this reason, among others: "False, fraudulent or misleading advertising of the practice of optometry or of any art, skill, knowledge, method of treatment or practice pertaining thereto;" provided that nothing therein

contained "shall be construed to prohibit" a licensee from issuing "appointment cards to his patients," or from displaying his "name on the premises" where he is engaged in practice, if "the information is limited to that of the professional card" and the lettering is not larger than four inches in height for street-level offices and six inches for offices above street level. The proviso makes illumination of the lettering permissible only during office hours; and the use of colored or neon lights is forbidden, also the "display" of "any eyeglass or eye sign, whether painted, neon, decalcomania, or any other, either in the form of eyes, or structure resembling eyes, eyeglass frames or eyeglasses or spectacles." Rules adopted by the administrative agency forbid, on penalty of revocation or suspension of the practitioner's license, the advertising of the price of spectacles, eye glasses or lens, frames or mountings, the free examination of eyes, and terms of payment. It is said that there is no relationship between the body of the subsection of the statute and the proviso; that a transgression of the restrictions of the proviso would not constitute "false, fraudulent, or misleading advertising;" and that the statute does not embody a norm or standard to guide the administrative authority "in deciding what is false, fraudulent of misleading as these words are used and then enlarged by the act itself," and is "so vague and indefinite" as to constitute a delegation of legislative power.

The phrase "false, fraudulent, or misleading advertising" constitutes a standard of conduct sufficiently definite and certain to permit of enforcement by the administrative agency without trenching upon the legislative domain. Generally, it embraces advertising that is intentionally false, deceitful or delusive or calculated to lead astray or to cause error. There can be no difficulty in classifying conduct in relation to this standard. That category does not embrace advertising that is entirely devoid of these elements; it does not serve to bar all advertising, however truthful, merely because advertising in itself is not deemed good professional practice. While the question is essentially one of intention,

viewing the statute as a whole, the office of a proviso is "to limit and restrict the operation of the enacting clause," and not to enlarge it. It is often used merely to insure against possible misunderstanding of the enacting clause. *New Jersey State Board of Optometrists v. S. S. Kresge Co., supra.* A penal provision is to be strictly construed. But subsection (j) forbids the display of spectacles, eyeglasses, frames, mountings, lenses, eyeglass cases, and ophthalmic instruments, tools and material of every kind, "or advertising of a commercial nature in office windows or reception rooms or in display cases outside of the offices, where the display of such merchandise, material or advertising would make it visible from the street." The need for this regulation as a means to the end sought to be attained is a matter exclusively for the judgment of the Legislature.

This is likewise true of *R. S.* 45:12–11(i), providing that the display of the optometrist's name in telephone and commercial directories and in directories in public or office buildings shall not be dissimilar in the size, shape or color of the type to that used for other practitioners of the healing arts in the same directory, and *R. S.* 45:12–11(k), forbidding the display of the practitioner's licenses, diplomas, or certificates in such a manner as to be visible from the outside of the office.

The defendant board is invested with authority to make "such rules and regulations not inconsistent with the law, as may be necessary for the proper performance of its duties * * *." *R. S.* 45:12–4. This is a grant of administrative power for the execution of the statutory policy; and its exercise is of necessity restrained by the declared policy and spirit of the statute and the criteria and standards therein laid down, for a grant not thus confined would constitute a delegation of essential legislative power in contravention of constitutional limitations. The distinction is between the making and the execution of the law. The authority to make rules and regulations for the effectuation of the statutory policy is administrative and not legislative, if its exercise is confined by certain and definite standards of action, even

though the regulations be given the force and effect of law. It is a corollary of this principle that the rules and regulations and administrative action cannot subvert or enlarge upon the statutory policy or the rules and regulations therein set down. Administrative implementation cannot deviate from the principle and policy of the statute.

It follows from the foregoing considerations that subsection (o) of R. S. 45:12–11 is invalid. It provides that the administrative agency may refuse, revoke or suspend a license to practice optometry for "Any conduct which, in the opinion of the board, is of a character likely to deceive or defraud the public." The conduct thus inhibited is not that which in law and in fact is of a character likely to "deceive or defraud the public," words of definite and certain meaning, but that which "in the opinion of the board" is of that character. This subjective test of conduct meriting disapproving action is so vague, indefinite, and uncertain as to render the provision void for want of due process. It is not sufficiently explicit to inform those subject to action thereunder as to the conduct which will render them liable to its penalties. Compare Connally v. General Construction Co., 269 U. S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322, 328 (1926). And it constitutes also a delegation of power that is essentially legislative rather than administrative. The qualifying phrase "in the opinion of the board" was not a part of the original provision. P. L. 1914, pp. 448, 452, c. 222, § 11; P. L. 1932, pp. 124, 127, c. 75, § 4. Its insertion by the amendment of 1948 is therefore significant of a legislative intention to effect a change of substance. We cannot disregard it as entirely meaningless.

As to R. S. 45:12–19, it suffices to say that there is no showing of injury to the plaintiff appellants if the provision be construed as doing more than forbidding the practice of optometry by one not a licensed practitioner of the art.

R. S. 45:12–18.1 provides that the optometric record of the patient's examination, including "all findings and pertinent facts concerning the patient discovered and disclosed

during the course of such examination, as well as the record of professional services rendered and the fees charged therefor shall, because of the confidential nature in the relationship, be the exclusive property of the optometrist who rendered the professional services to the patient;" and that "Any unauthorized use by any other person, firm or corporation of the information contained therein shall constitute an infringement of the property rights of the patient and the optometrist," and shall subject the offender to a civil suit for damages by the person aggrieved. It is said that this provision "is for the benefit of the optometrist and not that of the public as it should legally be;" and it is suggested that the plaintiff corporation here, Abelson's, Inc., has a pecuniary interest in retaining possession of the optometric record as against its employed optometrists.

 The statutory license to practice optometry is individual and personal. It is founded upon demonstrated scientific knowledge and professional skill. There is no provision for the issuance of such a license to a body corporate. There are obvious reasons of policy for vesting the property in the record in the optometrist who actually rendered the service to the patient. See, e. g., McGarry v. J. A. Mercier Company, 272 Mich. 501, 262 N. W. 296, 100 A. L. R. 549 (1935). The statute grounds the regulation in the "confidential nature of the relationship;" and it is clear that this characterization is not arbitrary or contrary to the fact. There are reasons also for lodging the title to the record in the employing optometrist as against his subordinate who actually rendered the service. But these contrasting considerations are peculiarly for the judgment of the legislative authority; and the action taken does not give rise to a justiciable question. The relation between the optometrist and his patient is personal and confidential and subject to reasonable legislative regulation in the common interest. The regulation cannot be deemed arbitrary or unreasonable.

The judgment is accordingly modified and, as so modified, affirmed, without costs to any of the parties as against the others.

426

*For modification*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.